## Thomas H. Brayshaw *vs.* James M. Ridout, Register of St. Margaret's (Westminster) Parish.

### *Register of Parish—Enrollment of Member of the Protestant Episcopal Church—Mandamus.*

Under the Act of 1798 ch. 24, known as the Vestry Act, requiring the register of the parish to enroll every person who is a resident of the parish and a member of the Protestant Episcopal Church, who shall apply for the purpose, on the books of the parish, the register's duty is merely mechanical and ministerial, and for a failure to perform it *mandamus* will lie.

Where the petitioner for a writ of *mandamus* to compel the register of a parish of the Protestant Episcopal Church to enroll him on the parish register, alleged as reasons therefor that he might vote at the Easter election of 1893, and that he might be eligible for election as a vestryman, his right to the relief sought is not affected by the fact that such reasons do not exist when the petition is heard.

APPEAL from the Circuit Court for Anne Arundel County.

The case is stated in the opinion of the Court.

The cause was argued before ROBINSON, C. J., BRYAN, PAGE, MCSHERRY, BOYD and BRISCOE, J.

*James M. Munroe,* for the appellant.

*Robert Moss,* for the appellee.

PAGE, J., delivered the opinion of the Court.

In the Court below Thomas H. Brayshaw filed his petition, in which he alleged:

1st. That St. Margaret's (Westminster) Parish in Anne

Arundel county is one of the parishes of the Protestant Episcopal Church of the United States in the diocese of Maryland, established under the provisions of the Act of the General Assembly of Maryland of the year 1798, entitled " An Act for the establishment of vestries for each parish in this State."

2nd. That he is a free white male citizen of the State of Maryland, thirty-three years of age, and is now, and for more than two years has been a resident of said parish, and " is now, and for twenty-five years last past has been, a member of said Protestant Episcopal Church, contributing to the charges of said parish, although the vestry of said parish has never in writing made known and declared any sum to be contributed by the members of said church towards the charges of said parish during the residence of your petitioner in said parish."

3rd. That by the said Act all persons " who shall have been entered on the books of the parish one month at least preceding the day of election as a member of the Protestant Episcopal Church " shall have a right of suffrage in the election of vestrymen, and all persons so qualified shall on every Easter Monday forever assemble, &c., and elect by ballot four vestrymen, &c.

4th. That by the Vestry Act it is provided that the vestry of every parish are obliged to provide a register, whose duty it is " to enroll every person of the Protestant Episcopal Church who shall apply for the purpose, on the books of the parish."

5th. That the appellee is the register of said parish, and has in his possession the books of the parish.

6th. That the appellant applied to him to enroll the petitioner, and at the time tendered six cents, and that the petitioner possessed all the qualifications entitling him to be enrolled, of which the register was informed, but refused to register him.

The petitioner thereupon prayed for a writ of *mandamus,* commanding the said Ridout, register, to enroll him

as a member of the Protestant Episcopal Church of the United States, &c., as required by the provisions of chapter 24 of the Acts of 1798, above referred to. To this petition the appellee demurred, and from the judgment of the Court sustaining the demurrer the appellant has appealed.

It is a principle too familiar to require citations to sustain it, that a demurrer admits all facts that are well pleaded. If facts, however, are pleaded which are insufficient in substance or immaterial, they are not admitted by the demurrer to be true. In the cases of *Brooke vs. Widdicombe*, 39 *Md.*, 400, and *Devin vs. Belt*, 70 *Md.*, 355, the Court held, that the facts stated in the pleading demurred to were not admitted, because they severally tendered an immaterial issue.

In order to determine what are the material facts alleged in this petition it is necessary to inquire what it was incumbent on the petitioner to prove, to entitle him to the relief for which he has prayed. This depends upon the construction of the Act of 1798, chapter 24, commonly known as the Vestry Act. The duty of the register who is to be appointed by the vestry, in respect to enrollment, is declared by the third section of the Act to be "to enroll every person of the Protestant Episcopal Church who shall apply for the purpose on the books of the parish." Any one, therefore, who is a resident of the parish, and " is of the church," that is, is a member of the church, may apply to the register, and it is the duty of the latter to enroll him.

The allegation in the petition therefore, that the petitioner is a member of the church, is a material fact necessary to be averred and proved before the petitioner had any standing in Court. It is not material to the decision of this case for us to determine how, or by what authority, a person becomes a member, for however that may be, it having been alleged as a fact that the petitioner is " a member," it is admitted by the demurrer to be true. We will say, however, because we are informed that other cases may depend upon our view of the matter, that in

our opinion membership in a church is an ecclesiastical matter depending upon the law of the church itself. The Act does not place it in the power of the register to declare who are or who are not members, and, for the purposes of this case, this is as far as it is necessary for the Court to determine.

The demurrer in this case therefore admits that the petitioner is a free white male citizen, over twenty-one years of age, a member of the Protestant Episcopal Church, a resident of the parish, and that he has applied for registration to the appellee, the register of the parish; and, if these things be so, it was the plain duty of the register to enroll him. The discharge of that duty, under these circumstances, involved the exercise of neither judgment nor discretion; it was a plain ministerial duty, for a failure to perform which a *mandamus* will lie.

The objection as to the name of the church is not material. It is clear what the petitioner meant when he referred to "The Protestant Episcopal Church of the United States in the diocese of Maryland." See *Bartlett, et al. vs. Hipkins,* 76 *Md.,* 17. Nor do we think that it affects the case, that the reasons alleged in the petition for the application, viz.: 1. That he might vote at the Easter election of 1893; and 2d, that he might be eligible for election as a vestryman, may not now exist. These allegations were not necessary to his case. If he was entitled to be enrolled, the particular reasons he entertained for desiring his name to be placed on the books need not have been stated. And apart from this, he might desire to be enrolled so that he could vote at future elections, and be eligible for vestryman whenever a vacancy occurred.

It follows from what we have said the judgment must be reversed, and the case remanded, that the *mandamus* may issue as prayed.

*Judgment reversed and*
*cause remanded, &c.*

(Decided 21st June, 1894.)

BRYAN, J., delivered the following separate opinion:

This case involves the right of the appellant to be enrolled as a member of the Protestant Episcopal Church. It is one of those unhappy controversies among members of religious bodies which sometimes come before Courts of Justice. It is not of our own choice that we sit in judgment in such cases. Far otherwise. It would be much more in accordance with our personal wishes if these questions were settled by some ecclesiastical authority having power to determine them. But the mandate of the law leaves us no alternative; and we may not upon any consideration shrink from the performance of our constitutional duty. We must pronounce the judgment which the law requires of us; but as members of a secular Court we enter upon the investigation before us in a spirit of becoming reverence. It is a relief to us to know that we have no power to decide any question of "*doctrine, discipline or worship;*" and that no one has a right to bring such a question before us. This principle, so consonant to our form of government, has been announced in many judicial decisions, and very expressly and clearly by this Court in *Tartar, et al., Trustees vs. Gibbs, et al.*, 24 *Md.*, 338-339. Upon it we stand, and by it we intend to abide. Where a civil right depends upon a question of an ecclesiastical character, we take without hesitation or debate the competent judgments of religious associations as far as respects their own members, and make them the basis of our determination of the civil right. *Watson vs. Jones*, 13 *Wallace*, 731.

In this case Brayshaw filed a petition for a writ of *mandamus* against Ridout. It was alleged "that St. Margaret's (Westminster) Parish, in Anne Arundel county, State of Maryland, comprising the third and fifth election districts of said county, is one of the parishes of the Protestant Episcopal Church of the United States in the diocese

Brayshaw *vs.* Ridout.

of Maryland, established under the provisions of chapter 24 of the Act of the General Assembly of Maryland, of the year 1798, entitled " An Act for the establishment of vestries for each parish in this State." That the petitioner " is a free white male citizen of the State of Maryland, thirty-three years of age, and is now and for over two years last past continuously has been, a resident of said parish, and is now, and for twenty-five years last past continuously has been a member of said Protestant Episcopal Church, contributing to the charges of said parish, although the vestry of said parish has never in writing made known and declared any sum to be contributed by the members of said church towards the charges of said parish during the residence of your petitioner in said parish." It was also alleged that Ridout is the register of the parish, and that the petitioner made application to him to be enrolled on the books of the parish as a member of the Protestant Episcopal Church, and that Ridout refused to enroll him. There were other allegations in the petition, but it is not necessary to consider them. Ridout answered the petition; but afterwards withdrew his answer, and demurred. The Court below sustained the demurrer, and rendered judgment for the defendant. The demurrer of course admitted all the facts in the petition which were properly pleaded. We are then to decide whether upon these facts the register was obliged to enroll the petitioner. It is well known that in this State, previously to the Revolution, the Church of England was established and maintained by the Government as a part of the public polity. From the Acts of 1702 (March session), chapter 1, we quote the title, and preamble and a portion of its first section as follows: " An Act for the establishment of religious worship in this Province according to the Church of England, and for the maintenance of ministers."

" Forasmuch as in well-grounded Christian common-

wealths matters concerning religion and the honor of God ought in the first place to be taken into consideration, and honest endeavors to attain to such good ends countenanced and encouraged, as being not only most acceptable to God, but the best way and means to obtain his mercy and blessing upon a people or country: Be it therefore enacted by the King's most excellent Majesty, by and with the advice and consent of this present General Assembly, and by the authority of the same, that the book of Common Prayer and Administration of the Sacraments, with other rites and ceremonies of the Church according to the use of the Church of England, the Psalter, or Psalms of David, and morning and evening prayer therein contained, be solemnly read by all and every minister or reader in every church which now is or hereafter shall be settled and established within this Province, and that all congregations and places for public worship according to the usage of the Church of England within this Province, for the maintenance of whose ministers, and the person officiating therein, any certain income or revenue, is or shall by the laws of this Province be established and enjoined to be raised or paid, shall be deemed settled and established churches; and for the encouragement of faithful and able ministers laboring in the words of the gospel to come and reside in this Province, &c." When independence was declared it became necessary to readjust the relations between Church and State. The property of the Church of England was solemnly guaranteed to it forever by the new government. It was no longer established as the State church; but such friendly legislation was enacted as was thought necessary to preserve and protect its rights, and to promote its well-being. In the meantime its name was changed, and it became known as the " Protestant Episcopal Church in Maryland." In furtherance of the general purpose of giving such aid to the church as the Legislature might rightfully give, the Act of the March

session of 1779, chapter 9, was passed. Its title and pre-amble are as follows: " An Act for the establishment of select vestries. Whereas it is thought expedient and ne-cessary that select vestries be chosen in every parish within this State for the preservation of the churches, and for the taking care of glebe lands, and for other purposes tending to the happiness and welfare of this State." By the Act of 1702 the vestries were elected by all the inhabit-ants of every parish who were freeholders within the par-ish, and who contributed to public taxes and charges there-of. By the Act of 1779 vestries were elected by all the inhabitants of the parish who were entitled to vote for delegates to the General Assembly, and who contributed to the charges of the parish. In course of time a change in the mode of electing vestries became desirable. Accord-ingly the Act of 1798, chapter 24, was passed, which is the present Vestry Act. It is stated in the preamble that it was represented to the General Assembly that the pre-vious legislation was inadequate to the exigencies of the Protestant Episcopal Church in this State, for which it was intended to provide. It was therefore enacted that " Every white male citizen of this State, above twenty-one years of age, resident of the parish where he offers to vote six months next preceding the day of election, who shall have been entered on the books of said parish one month at least preceding the day of election as a member of the Protestant Episcopal Church, and who shall also contribute to the charges of the said parish in which he offers to vote, such sum as a majority of the vestry, in each parish, shall annually, within ten days after their election, in writing make known and declare, not exceed-ing two dollars, shall have the right of suffrage in the election of vestrymen for such parish." The third section enacts that it shall be the duty of the register of the parish to enroll any person of the Protestant Episcopal Church who shall apply for the purpose, on the books of the parish,

under the penalty of eight dollars. The fifth section enacted that the vestrymen of each parish, or a majority of those who shall attend, shall judge of the election of vestrymen, and of the qualification of voters, and of parishioners proposed to be elected as vestrymen. The ninth section enacted that the vestry as trustees of the parish should have an estate in fee simple in all churches and chapels, and in all glebes and other lands, and should have a good title and estate in all other property theretofore belonging to the Church of England, or which should thereafter belong to said church, which the section states was then called the Protestant Episcopal Church in Maryland. The fifteenth section gave the vestry power to choose ministers of the church to perform their duties in the parish. The thirty-second section incorporated the vestry of every parish. The detailed statement which we have made shows that the name of the Church of England was changed, and that it was separated from the political government of the State; but that the other changes were made for the purpose of enabling the church to preserve and protect its property, and more efficiently to provide for its pastoral service. No thought was entertained of making any change in doctrine, discipline or worship; and such an attempt would have been at variance with the fundamental principles on which the new State government was founded.

We are now prepared to inquire what powers and rights belong to the register of a parish when a member of the church applies to him for enrollment on the books of the parish. Is he invested with any judicial functions to determine the question of membership? Has he any discretionary power in the premises? As the Church of England up to the time of the Revolution was the established church of the State, its doctrines, rites, usages and ceremonies were matters of public knowledge which the Courts were bound judicially to know. In all the ages of its ex-

istence it has uniformly admitted members into its communion by the sacrament of baptism, and in no other way. Its ministers in holy orders as part of the sacred office make this solemn declaration: "We receive this person into the congregation of Christ's flock." And its members can not be expelled except by the administration of ecclesiastical discipline adjudged in the due course of ecclesiastical authority. The Court must judicially know that this was the case at the time of the Revolution; and the Court ought judicially to declare that it must be the case now, unless a change has been made. Now, what intimation has there been that any change has taken place? None whatsoever. In point of fact it is well known to thousands and tens of thousands of persons that the baptismal office and its effects and consequences remain the same as they have ever been. But we are not to decide this question on any personal knowledge which we may have on the subject. We act as the impersonal organs of the law, and make the declaration which it commands us to make, as a deduction from its general principles. We then have no difficulty in saying that a register of a parish has no right to adjudge and determine who is a member of the church. His duties are by the statute merely mechanical and ministerial, as the law terms them. He is to enroll or make a list of the members. Vestries were authorized to appoint registers by all the Acts of Assembly which we have cited, and their duties have always been of the same character. They are merely secretaries or scribes; their business is to "*keep true and fair entries* of the proceedings of the vestry," and "to enter in a book provided for the purpose, all baptisms, marriages and funerals of free persons in the parish," and to do such like things. He has no concern whatever with the qualification of voters. By the fifth section of the Act of 1798 this duty is confided exclusively to the vestry. We shall decide on the record before us that Brayshaw ought to be enrolled on the books of the parish.

It has been said that the Church has been misdescribed in the petition; that it is not properly styled "The Protestant Episcopal Church of the United States in the diocese of Maryland." We regard this objection as having little weight. It is impossible to misapprehend the meaning of the petition in this particular. It designates clearly enough the parish intended to be described as Saint Margaret's.

The order of the Circuit Court ought to be reversed, and the cause remanded, in order that a writ of *mandamus* may be issued according to the prayer of the petition.

*Reversed and remanded.*

(Filed 21st June, 1894.)